# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1306

_____

United States of America

*Plaintiff - Appellee*

v.

Gilberto Ray Ramos

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: September 19, 2016
Filed: March 27, 2017

_____

Before WOLLMAN, ARNOLD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Gilberto Ray Ramos was convicted after trial of multiple drug offenses, as well as the offense of being a felon in possession of a firearm. He appeals those convictions, arguing that they were supported by insufficient evidence, that the district court erred in admitting an exhibit that included an Arkansas Parole Board

Waiver of Revocation Hearing form he signed, and that his sentence is substantively unreasonable. We affirm in part and reverse in part.

## I. Background

Law enforcement first became interested in Ramos during a wiretap investigation of another individual, Abraham Duran. One of the wiretap monitors, Gary Gregory, testified that he had monitored and translated three calls between Duran and another individual with a telephone number ending in 0679. During one of the calls, Duran asked the individual if he needed "more." During another call, Duran told the individual to call him so Duran could "take [him] the other part." Duran was eventually arrested for and convicted of distribution of methamphetamine, and, pursuant to a plea agreement, cooperated with law enforcement officers in their investigation.

Duran testified at trial that Ramos was the individual he had been speaking to in the three intercepted calls. Duran testified that the calls related to his agreement with Ramos to distribute methamphetamine. According to Duran, he supplied Ramos with methamphetamine at Ramos' residence at the Brookhaven Apartments in Springdale, Arkansas. Duran also testified about a text message that law enforcement had retrieved from his phone. According to Duran, in the text message, Ramos was offering to sell him a .40 caliber firearm.

Detective Preston Oswalt testified that he arranged for a confidential informant, Armando Gonzales, to make controlled purchases of methamphetamine from Ramos. Based on information provided by Gonzales, Oswalt located an apartment that he believed was Ramos' at the Brookhaven Apartments. According to Oswalt, Springdale water records listed Ramos as the occupant of the apartment. Gonzales made controlled purchases of methamphetamine at the apartment on three occasions. Each time, Gonzales purchased one gram of methamphetamine for $100. After the

first purchase, Oswalt showed Gonzales a known photograph of Ramos, and Gonzales confirmed that Ramos had been the one to sell him the methamphetamine. Gonzales also testified at trial. According to Gonzales, he offered to work with the police in order to reduce his punishment for drug possession charges. Gonzales also identified Ramos in court as the man who sold him the methamphetamine.

Oswalt testified that on December 5, 2014, he and other police officers executed a search warrant at the apartment. Before they executed the warrant, officers saw a man and a woman approach the apartment and knock on the door. Another woman, later identified as Jasmyn Schmid, answered the door. Oswalt testified that in his understanding, Schmid was living at the apartment at the time. Schmid and the other two individuals left the residence together in a vehicle. Officers stopped the vehicle, and questioned and searched Schmid. They found a marijuana pipe, a methamphetamine pipe, a digital scale, and user amounts of marijuana and methamphetamine, and arrested her for drug possession. Then, officers searched the apartment. In the kitchen, they found a ledger, digital scale, baggies, and cash, as well as approximately two ounces of methamphetamine in Kool-Aid containers in the freezer. In one of the two bedrooms, they found a .45 caliber pistol under the mattress, next to a pink vibrator. The bedroom closet contained men's and women's clothing. The other bedroom's closet also contained men's clothing. On February 19, 2015, law enforcement located Ramos at his mother's residence and arrested him. The officers searched the residence, and found a water bill for the Brookhaven apartment in Ramos' name.

At the time he was arrested, Ramos was on parole for an Arkansas criminal conviction. Ramos' parole officer Taylor Sevier[1] testified at trial that he notified Ramos on February 23, 2015, that he was seeking to revoke Ramos' release. He

[1]Taylor Sevier's name was Taylor Pennington at the time of the parole revocation proceedings.

provided Ramos with a form titled Notice of Parole Violation Action (Notice Form), which listed the alleged violations.

Sevier testified that he informed Ramos he had a right to a revocation hearing. Instead, on March 10, 2015, Ramos signed a form titled Arkansas Parole Board Waiver of Revocation Hearing (Waiver Form), in which he waived his right to a hearing and admitted to the alleged violations. The Waiver Form states, in part, "I admit that I have violated the following condition(s) of release as alleged[.]" Underneath, boxes labeled "#4 Laws" and "#5 Weapons" are marked. At the bottom of the form are the dated signatures of Ramos, Sevier, and a hearing judge. The Notice Form previously provided to Ramos includes more detail regarding his alleged violation of the "#4 Laws" release condition:

#4 Laws: Count 1) Over the last four months Ramos committed the offense of Possession of a Controlled Substance with Purpose Schedule II (Methamphetamine). Count 2) Over the last four months Ramos committed the offense of Simultaneous Possession of Drugs and Firearms. Count 3) Over the last four months Ramos committed the offense of Possession of Drug Paraphernalia. Count 4) Over the last four months Ramos committed the offense of Possession of a Controlled Substance Schedule VI. Count 5) Over the last four months Ramos committed the offense of Possession of a Controlled Substance Schedule II (Acetaminophen/Hydrocodone). Count 6) Over the last four months Ramos committed the offense of Delivery of a Controlled Substance Schedule II (Methamphetamine). Count 7) Over the last four months Ramos committed the offense of Delivery of a Controlled Substance Schedule II (Methamphetamine). Count 8) Over the last four months Ramos committed the offense of Delivery of a Controlled Substance Schedule II (Methamphetamine). Count 9) Over the last four months Ramos committed the offense of Theft by Receiving. Count 10) Over the last four months Ramos committed the offense of Possession of a Firearm by Certain Person.

The government offered the Waiver Form and Notice Form into evidence as a single exhibit, Exhibit 37. Ramos objected under Rule 403 of the Federal Rules of Evidence. The district court overruled the objection, and admitted the exhibit.

The jury ultimately convicted Ramos of one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; three counts of distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); one count of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1); and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The jury acquitted Ramos of one count of knowingly possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). The district court sentenced Ramos to 148 months for each of the drug offenses, and 120 months for the offense of being a felon in possession of a firearm, to run concurrently. Ramos timely appealed.

## II. Discussion

Ramos appeals on the grounds that there was insufficient evidence to support his convictions, that the district court erred in admitting Exhibit 37, and that his sentence was substantively unreasonable.

## A. Sufficiency of the Evidence

First, Ramos argues there was insufficient evidence to support his convictions. Ramos did not move for judgment of acquittal at the close of the government's case—a failure that would ordinarily necessitate plain-error review. United States v. Calhoun, 721 F.3d 596, 600 (8th Cir. 2013). Here, however, the district court *sua sponte* considered the sufficiency of the evidence at the close of the evidence as if Ramos had moved for a judgment of acquittal, and ruled that it would deny such a motion. A basic reason for requiring litigants to preserve issues for appeal is to give

the district court an opportunity to prevent or correct mistakes in the first instance. United States v. Simms, 757 F.3d 728, 733–34 (8th Cir. 2014). Here, the district court had that opportunity and took it when it considered the question as if Ramos had raised it. Even if Ramos technically forfeited, or even waived, his right to move for a judgment of acquittal, he did not forfeit or waive his right to appeal from the trial court's *sua sponte* order holding that the evidence was sufficient to sustain a guilty verdict. At least one other circuit has, in a similar situation, reviewed the record de novo rather than for plain error. See United States v. Wolff, 370 F. App'x 888, 891–92, 891 n.1 (10th Cir. 2010) (unpublished). Accordingly, we will "review the sufficiency of the evidence to sustain a conviction de novo, viewing the evidence in the light most favorable to the jury's verdict and reversing the verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Ways, 832 F.3d 887, 894 (8th Cir. 2016).

### 1. Drug convictions

Initially, Ramos argues there was insufficient evidence to support his convictions for distribution of methamphetamine, possession with intent to distribute methamphetamine, and conspiracy to distribute methamphetamine. He contends that Duran's testimony was insufficient to establish a conspiracy, that insufficient evidence connects him to the apartment where the methamphetamine was found, and that Gonzales' testimony was inconsistent and unreliable.

To prove that a defendant distributed methamphetamine in violation of 21 U.S.C. § 841(a)(1), the government is required to prove that the defendant distributed the methamphetamine, and that he knew it was a controlled substance at the time of distribution. See United States v. Hernandez, 569 F.3d 893, 896 (8th Cir. 2009). To establish that a defendant possessed methamphetamine with the intent to distribute it under 21 U.S.C. § 841(a)(1), "the government must prove that the defendant (1) knowingly possessed the methamphetamine; and (2) had intent to distribute it."

-6-

United States v. Trejo, 831 F.3d 1090, 1094 (8th Cir. 2016).  And "[t]o establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." United States v. Jiminez, 487 F.3d 1140, 1146 (8th Cir. 2007) (quoting United States v. Espino, 317 F.3d 788, 792 (8th Cir. 2003)).

First, Ramos argues that there was insufficient evidence to support his conviction for conspiracy to distribute methamphetamine, because the only evidence connecting him to the purported conspiracy was Duran's testimony.  According to Ramos, Duran's testimony was insufficient for this purpose because it was conclusory and uncorroborated, and because Duran was promised a reduced sentence in exchange for testifying.  But accomplice testimony need not be corroborated to support a conviction.  See United States v. Fuller, 557 F.3d 859, 863 (8th Cir. 2009).  Unless the testimony is implausible on its face, which Duran's testimony was not, we defer to the jury's determination of whether an accomplice is credible.  Id.

Next, Ramos argues that there was insufficient evidence that he possessed or distributed methamphetamine.  He contends that the government failed to prove he resided in the apartment where the methamphetamine was found, and that, in fact, Schmid was the person residing at the apartment.  He points out that officers did not see him entering or leaving the apartment before executing the search warrant, and that Oswalt was unable to see who was selling methamphetamine to Gonzales during the controlled purchases.  However, other evidence indicated that Ramos lived at the apartment:  Water records listed him as the resident, Duran testified that Ramos lived there, Gonzales identified Ramos as the person who sold him methamphetamine at that apartment, and Sevier testified that Ramos gave him the address of the apartment as his residence.  Given the evidence presented, we cannot say no reasonable jury could find that Ramos possessed and distributed methamphetamine.

Finally, Ramos argues that Gonzales' testimony was unreliable, because Gonzales testified that the first time he made a controlled purchase from Ramos, Ramos was already at the apartment when he arrived. This was inconsistent with Oswalt's testimony that the man who sold methamphetamine to Gonzales that day met him at the apartment on a motorcycle. When cross-examined, Gonzales testified that he might be remembering events incorrectly, and admitted that it was possible he did not remember who he bought drugs from that day. But it is within the province of the jury to resolve conflicting testimony and make credibility determinations, and we will not disturb those findings on appeal. United States v. Coleman, 525 F.3d 665, 666 (8th Cir. 2008). In sum, we conclude that Ramos' drug convictions were supported by sufficient evidence, and the district court did not err by not entering a judgment of acquittal.

## 2. Felon in possession of a firearm conviction

Ramos additionally argues that there was insufficient evidence to support his conviction for being a felon in possession of a firearm, because the gun was found under a mattress next to a pink vibrator, and there was women's clothing in the closet of the bedroom where it was found. Furthermore, Ramos notes, although Duran testified that Ramos tried to sell him a .40 caliber gun, the gun found in the bedroom was a .45 caliber, and neither Oswalt nor Duran ever saw Ramos with a firearm.

A conviction for being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) may be based on constructive possession. United States v. Boykin, 986 F.2d 270, 274 (8th Cir. 1993). "[C]onstructive possession requires both knowledge that the contraband is present and dominion over the premises where the contraband is located." Ways, 832 F.3d at 897. Some of our cases have concluded that dominion over the premises can be sufficient by itself to prove constructive possession, because dominion may "give[] rise to a strong inference of knowledge." United States v. Dooley, 580 F.3d 682, 686 (8th Cir. 2009) (explaining why some cases appear to

elide the distinction between knowledge and dominion). But such an inference is not warranted under the facts of every case. See id. ("[T]his inference may be rebutted if other evidence contradicts it."). Thus, mere dominion is not always sufficient to establish constructive possession. See, e.g., Ways, 832 F.3d at 897–88; United States v. Smith, 508 F.3d 861, 867 (8th Cir. 2007); United States v. Pace, 922 F.2d 451, 453 (8th Cir. 1990).

One context where mere dominion is insufficient to show that the defendant knowingly possessed a gun is in cases involving joint occupancy. We have explained that "when there is joint occupancy of a residence, dominion over the premises by itself is insufficient to establish constructive possession." United States v. Wright, 739 F.3d 1160, 1168 (8th Cir. 2014). Rather, the government must provide additional evidence of a link between the contraband and the defendant. Id. Otherwise, a father could be imprisoned for marijuana that his son has hidden in the house, or a wife could be jailed for her husband's secret cache of illegal guns. See id. at 1174 (Riley, C.J., concurring).

Here, because Ramos jointly occupied the apartment with Schmid, the government was required to provide some evidence linking him to the gun beyond his dominion over the apartment. The government points to evidence that the officers found some men's clothes in the closet in the bedroom where the gun was found. But they also found women's clothes in that closet and men's clothes in the other bedroom's closet. Further, the gun was found under the mattress next to a pink vibrator. It is unclear whether Ramos, though he lived at the apartment, exercised any control over the bedroom where the gun was found. On this evidence, it is more than possible that Ramos was convicted because Schmid had a weapon that Ramos did not know about. A reasonable jury could not conclude beyond a reasonable doubt to the contrary.

We acknowledge the government presented evidence that Ramos tried to sell a different gun to Duran and admitted in the Waiver Form[2] that he violated a condition of parole involving "Weapons." But neither of these facts ties Ramos to the particular gun that he was charged with possessing. Although this evidence may demonstrate that Ramos had access to a gun, as the government argues, it does not mean that he had access to *this* gun or that he even knew about it. And though the firearm likely belonged to either Ramos or Schmid or both, "a conscientious mind would have to have entertained a reasonable doubt" about whether Ramos constructively possessed it. See United States v. Hall, 999 F.2d 1298, 1299 (8th Cir. 1993). Because insufficient evidence supported Ramos' conviction for being a felon in possession of a firearm, we reverse the judgment as to that conviction.

**B. Admission of Exhibit 37**

Ramos also argues that the district court abused its discretion in overruling his Rule 403 objection and admitting Exhibit 37 into evidence. Ramos argues that the exhibit was more prejudicial than probative because he may not have been aware that his admissions on the Waiver Form could be used against him in a federal prosecution, because he signed the form without benefit of counsel, because he was not under oath when he signed the form, because he signed the form to avoid the risk of receiving a longer revocation, and because a parolee is entitled only to limited due process rights at a parole revocation hearing.

Evidence may be excluded under Rule 403 of the Federal Rules of Evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. "Evidence is not

---

[2]As explained in Part B, the Waiver Form was improperly admitted. However, we consider both properly admitted evidence and improperly admitted evidence in determining whether sufficient evidence supports a conviction. Lockhart v. Nelson, 488 U.S. 33, 41 (1988).

unfairly prejudicial because it tends to prove guilt, but because it tends to encourage the jury to find guilt from improper reasoning. Whether there was unfair prejudice depends on whether there was an 'undue tendency to suggest decision on an improper basis.'" United States v. Looking Cloud, 419 F.3d 781, 785 (8th Cir. 2005) (quoting United States v. Sills, 120 F.3d 917, 920 (8th Cir. 1997)). A district court's decision to admit evidence is reviewed for abuse of discretion. United States v. Farrington, 499 F.3d 854, 859 (8th Cir. 2007). For a Rule 403 challenge, "great deference is given [to] the district court's balancing of the probative value and prejudicial impact of the evidence." Id. (alteration in original) (quoting United States v. Ruiz, 412 F.3d 871, 881 (8th Cir. 2005)). Recognizing the deference owed the district court in resolving evidentiary issues such as this one, we nevertheless conclude that Exhibit 37 was improperly admitted.

To begin with, we note that although a defendant's admissions are usually considered highly probative, the probative value of the admissions here is diminished because of the context in which they were made. First, because Ramos made the admissions during parole revocation proceedings, he was not entitled to "the full panoply of rights applicable to a criminal trial." Morrissey v. Brewer, 408 U.S. 471, 499 (1972). Thus, as Sevier testified, Ramos did not have an attorney present, and was not under oath, when he signed the Waiver Form. Additionally, the requirements of Rule 11 of the Federal Rules of Criminal Procedure—which are intended to ensure that a plea is knowing and voluntary—do not apply to a parolee's admissions to parole violations. United States v. Rapert, 813 F.2d 182, 185 (8th Cir. 1987). Furthermore, Sevier testified that signing the Waiver Form automatically revoked Ramos' release for six months. According to Sevier, if Ramos had chosen to attend a revocation hearing instead of signing the Waiver Form, the hearing examiner could have revoked his release for up to a year. And if Ramos had chosen to proceed to a revocation hearing, the alleged violations would have had to be proven by only a preponderance of the evidence, Ark. Code Ann. § 16-93-705(a)(6), the rules of evidence would not have strictly applied, Lemons v. Arkansas, 836 S.W.2d 861, 863

-11-

(Ark. 1992), the Fourth Amendment exclusionary rule would not have strictly applied, Dabney v. Arkansas, 646 S.W.2d 4, 5 (Ark. 1983), his right to cross-examine and confront adverse witnesses could have been limited by the hearing examiner, Ark. Code Ann. § 16-93-705(d)(1), and he would have had no right to a jury, see Ark. Code Ann. § 16-93-705(a)(6). Under these circumstances, there was a substantial likelihood that Ramos could have chosen not to contest the alleged violations, and waived his right to a hearing, for a number of reasons other than factual guilt, thus limiting Exhibit 37's probative value.

Even more important in this case, however, is that any probative value the exhibit had was substantially outweighed by the risk of unfair prejudice to Ramos. First, the Waiver Form bears an official seal, legal terminology, and multiple signatures, including the signature of a hearing judge. These features lend the Waiver Form "the imprimatur of the judicial system and indicia of official reliability," creating a strong possibility that the jury would give it more weight than it deserved. United States v. McCallum, 584 F.3d 471, 476 (2d Cir. 2009) (discussing the prejudicial impact of evidence of prior convictions under the Rule 403 balancing test); cf. Carter v. Burch, 34 F.3d 257, 265 (4th Cir. 1994) (concluding that a judge's findings in a different proceeding should be excluded under Rule 403 because it is likely a jury would "place[] undue weight on such evidence"). Additionally, the conduct Ramos admitted to is not necessarily the same as the conduct that forms the basis for the present federal charges. On the Waiver Form, Ramos admitted generally to violating "#4 Laws" and "#5 Weapons." But the Notice Form alleged ten separate parole violations, some of which have potential relevance to the federal charges, and some of which appear unrelated. It is not clear exactly which of the alleged violations Ramos was admitting to: It could have been one, some or all of them. See United States v. Hines, No. 1:12-cr-204-JAW, 2013 WL 1668232, at *7 (D. Me. Apr. 17, 2013). Thus, not only was the jury likely to give Exhibit 37 undue weight, allowing it into evidence was also likely to confuse the issues and mislead the jury into basing its decision on an irrelevant, or even nonexistent, admission.

We must now consider whether the error in admitting Exhibit 37 requires reversal. We will not reverse an erroneous evidentiary ruling if the error was harmless. United States v. McPike, 512 F.3d 1052, 1055 (8th Cir. 2008). "An evidentiary error is harmless when, 'after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.'" Id. (quoting United States v. Lewis, 483 F.3d 871, 875 (8th Cir. 2007)). Because we have already determined that Ramos' firearm conviction was not supported by sufficient evidence (even with Exhibit 37) we consider only whether the admission of Exhibit 37 was harmless error as to Ramos' drug convictions.

The government's evidence here included Duran's testimony that he agreed to provide Ramos with methamphetamine to distribute; Gonzales' testimony that he bought methamphetamine from Ramos, whom he identified by photograph after making the first purchase, as well as in court; and Oswalt's testimony that methamphetamine was found in Ramos' apartment. Their testimony was corroborated by the telephone calls intercepted on the wiretap; water records that listed Ramos as a resident of the apartment; and the fact that, consistent with Gonzales' account of events, the methamphetamine was found in Kool-Aid containers. In light of this overwhelming evidence, we conclude that the erroneous admission of Exhibit 37 was harmless with respect to Ramos' drug convictions.

## C. Sentencing

Finally, Ramos challenges his sentence on the grounds that it is substantively unreasonable because it is greater than necessary to serve the purposes of punishment outlined in 18 U.S.C. § 3553(a). However, it is unnecessary to reach this issue, because we find that Ramos' drug convictions should be remanded for resentencing. "Where we reverse one of several of a defendant's criminal convictions, we remand

-13-

for resentencing if 'we are uncertain whether [the district court] would have imposed the same or somewhat lesser sentences for the remaining convictions as it did originally.'" United States v. Thompson, 690 F.3d 977, 996 (8th Cir. 2012) (alteration in original) (quoting United States v. Schwartz, 924 F.2d 410, 426 (2d Cir. 1991)).

Here, the district court applied a two-level enhancement to its calculation of Ramos' offense level for his drug convictions on the grounds that he possessed a dangerous weapon, pursuant to United States Sentencing Guidelines § 2D1.1(b)(1). Because we have reversed Ramos' conviction for being a felon in possession of a firearm, it is uncertain whether the district court would impose the same sentence for the drug convictions as it did originally. See United States v. Burrage, 747 F.3d 995, 998 (8th Cir. 2014). Accordingly, we will remand Ramos' drug convictions to the district court for resentencing.

## III. Conclusion

As to Ramos' conviction for being a felon in possession of a firearm, the judgment of the district court is reversed and remanded with directions to enter a judgment of acquittal. Ramos' remaining convictions are remanded to the district court for resentencing on the existing record.

ARNOLD, Circuit Judge, concurring.

I concur in the result in this case. I would not reach the question of whether the district court erred in admitting Ramos's admission because I agree that any error in doing so was harmless. The conclusion that there was error is therefore dictum. *See United States v. Monaco*, 735 F.2d 1173, 1178 (9th Cir. 1984) (Duniway, J., concurring and dissenting); Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1268 (2006).

WOLLMAN, Circuit Judge, concurring and dissenting.

I concur in the holding that the evidence was sufficient to support Ramos' conviction on the drug charges.

I dissent from the reversal of Ramos' conviction on the felon in possession charge. In contrast to the situation in United States v. Dooley, Ramos does not challenge the adequacy or accuracy of the district court's instructions regarding the elements of knowing possession of the firearm. He does not, and indeed could not, argue that the had no possessory interest in the premises at which the gun was found, and so we are not presented with the specter of possible inadvertent possession, as in Dooley. Nor need we concern ourselves with fathers being imprisoned for the marijuana hidden by their wayward sons, nor with wives being jailed for their husbands' secret caches of illegal guns, the worst-case scenarios suggested by the concurring opinion in United States v. Wright.

True enough, the .40 caliber gun that Ramos offered to sell to his drug supplier was not the .45 caliber gun found at his apartment, but that offer, when coupled with what I consider to be the properly admitted evidence of his parole revocation waiver admissions concerning firearms possession, cuts mightily against the argument that he did not knowlingly possess the .45 caliber gun. Unlike the situation in United States v. Hall, I disagree with the conclusion that there was no evidence from which a reasonable mind could find guilt beyond a reasonable doubt on the weapons charge. While acknowledging the factual differences that existed in United States v. Butler, 594 F.3d 955 (8th Cir. 2010), I would follow the holding in that case and affirm the conviction on the weapons charge.

_____

-15-